# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| RONALD ANDERSON, | Civil No. 09-1912 (JRT/JJK) |
| Plaintiff, | |
| v. | |
| CITY OF HOPKINS; HOPKINS POLICE DEPARTMENT; OFFICER KREILING; OFFICER PILON; OFFICER HILL *and* JANE DOE AND RICHARD ROE, UNKNOWN AND UNNAMED HOPKINS POLICE OFFICERS, *personally and individually, and in their individual capacities as Hopkins Police Officers* | **MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| Defendant. | |

Gregory S. Bachmeier, **BACHMEIER LAW OFFICE**, 6445 Sycamore Court North, Suite 102, Maple Grove, MN 55369, for plaintiff.

Jason M. Hively, **IVERSON REUVERS**, 9321 Ensign Avenue South, Bloomington, MN 55438, for defendants.

Plaintiff Ronald Anderson brought a claim against the Hopkins Police Department, the City of Hopkins, and various Hopkins police officers (collectively, "defendants"), for injuries allegedly sustained during the officers' intervention and prevention of Anderson's attempted suicide.  Anderson claims that he was injured both when he was "tackled," and after he was handcuffed and pulled to his feet.  Defendants move for summary judgment arguing the officers' actions were reasonable, did not constitute excessive force, and did not violate Anderson's constitutional rights.  Because

the Court finds that qualified and official immunity do not apply to Officer Kreiling, the Court grants in part, and denies in part the motion, and dismisses the Hopkins Police Department, Officers Pilon, Hill, Jane Doe, and Richard Roe as defendants.

## BACKGROUND

On July 23, 2008, Anderson called 911 and said a "suicide [is] in progress."  (Tr. of Recorded Proceedings 2:2, Aff. of Andrea B. Wing Ex. A, dep. ex. 3, Docket No. 15.) During the call, Anderson said:

> [I]'m going to slit my throat here in a minute . . . .  They don't fucking believe what I'm going to do to myself, and before the guy gets in the fucking door, he's going to see one bleeding son-of-a-bitch . . . .  I'm cutting my throat . . . . I know how to do it . . . .  I'm dying tonight, all right? . . . . The only reason I'm making this fucking phone call is so my fucking daughter don't find me with my throat cut . . . .  I don't want her to find me with my fucking throat cut . . . .  Before you boys get here, I'm going to be dead. Good-bye . . . .

(*Id.* at 2-8.)  Nichole L. Fernandez was the Public Safety Dispatcher who answered Anderson's call.  On July 9, two weeks prior to the July 23 call, Fernandez spoke to Anderson when he called 911 complaining of pain.  Anderson told Fernandez that he needed additional treatment for pain, and was afraid he might hurt himself, but did not have a plan.  Fernandez says "it was clear that the purpose of the [July 9] call was much more focused around complaining about and getting treatment for his pain."  (Aff. of Nichole L. Fernandez ¶ 3, Docket No. 19.)  Fernandez noted that the "July 23, 2008 call was very different.  Mr. Anderson immediately declared a suicide was in progress . . . he seemed genuinely concerned about the possibility of his daughter finding him dead."  (*Id.* ¶ 4.) Fernandez testified that Anderson sounded convicted about committing suicide, had

a plan for how to do it and the manner, which was unusual and more violent than other threats she had heard from him.  Anderson stayed on the phone with the dispatcher until the police officers arrived.  The 911 call transcript recorded the following exchange between Anderson and Officer Kreiling:

| | |
|---|---|
| Anderson: | [S]omebody is knocking at the door.  You guys – fuckers are going to knock . . . .  Come on in |
| Kreiling: | Step out of the kitchen Ron.  Do it now.  Step out of the kitchen. |
| Anderson: | I'm going to cut my fucking throat . . . . |
| Kreiling: | No you're not. |
| Anderson: | Ow, ow, ow, ow, ow . . . do you know how bad you just hurt me? |
| Kreiling: | Where do you hurt, Ron? |
| Anderson: | Oh, my shoulder |
| Kreiling: | Okay. Next time you're going to (inaudible). |

(Tr. of Recorded Proceedings 8:16-9:9.)  Kreiling testified in his deposition that he said "Next time you are going to listen to a police officer."  (Dep. of Craig Kreiling ("Kreiling Dep.") 52:1-14., Wing Aff. Ex. A.)  Kreiling was also carrying a Taser gun, which he drew prior to entering Anderson's apartment.  The Taser has a video camera on the handgrip that is activated when turned on.  A transcript of the recording made from the video camera records more of the dialogue between Kreiling and Anderson:

| | |
|---|---|
| Kreiling: | Ron, it's the police department.  I need you to come to the door right now.  Ron. Step out of the kitchen, Ron.  Do it now.  Step out of the kitchen. |

Anderson:      I'm going to cut my fucking throat . . . .

(Tr. of Recorded Proceedings 10:20-25.)

Kreiling testified that "he did not want Mr. Anderson in the kitchen area due to the report he was going to slit his throat and knives are present in most kitchens." (Kreiling Aff. ¶ 4, Docket No. 18.)   Kreiling stated that Anderson ignored his commands and continued to walk into the kitchen where Kreiling could not see him.  Kreiling "decided not to use [his] Taser due to the possibility it may not have enough of an effect to prevent Mr. Anderson from reaching the kitchen table." (*Id.* ¶ 5.)  He describes his "take down" of Anderson as follows:

> With my Taser still in my right hand, I grabbed Mr. Anderson's left wrist with my left hand and put pressure on his upper left arm with my right forearm and forced him to the ground.  During the maneuver Mr. Anderson struck his head and right side of his body on the north countertop of the galley kitchen . . . .   While handcuffing Mr. Anderson, I smelled a strong odor of alcohol coming from his breath and person . . . .  I believe he was intoxicated . . . .  I never put a knee on Mr. Anderson's back.

(*Id.* ¶ 5-6.)  In his deposition, Kreiling described his comment that "next time" Anderson would listen to a police officer as "sarcastic." (Kreiling Dep. 52:15-19.)

Kreiling testified that after he checked Anderson for weapons, " I rolled Anderson on to his side and sat him up on the kitchen floor.  I had Mr. Anderson bend his left leg at the knee and Officer Pilon and I rolled him to his feet." (*Id.* ¶ 10.)  A Hennepin County Medical Center ("HCMC") ambulance crew arrived and assessed Anderson, determining that he did not need emergency medical treatment.  Kreiling stated that "at no time during our entire interaction was Mr. Anderson lifted by his arms." (*Id.* ¶ 16.)

At HCMC, Anderson was diagnosed with a fracture through the humerical surgical neck and impaction of the shaft into the femoral head.  A doctor found degenerative changes present at the acromion and at the biceps tendon insertion, and a fracture of the femoral head.  (Radiology Report, Aff. of Gregory S. Bachmeier Ex. D, Docket No. 24.)  Anderson's discharge summary noted that he had "Left 6[th]-9[th] ribs fracture in struggle with police" and that he was in alcohol withdrawal after being intoxicated.  (Discharge Summary, Bachmeier Aff. Ex. E.)

On September 8, 2008, Anderson underwent surgery for his right arm.  In a letter, Anderson's surgeon, Dr. Robert Wengler, said that of the two possible causes of the arm fracture, he found it plausible that the fracture occurred from a situation like the one Anderson described, where he was jerked up from the floor with his hands cuffed behind his back.[1]  (Letter from Dr. Robert Wengler, Bachmeier Aff. Ex. H.)

Defendants' medical expert, Dr. Gary Wyard, reviewed Anderson's extensive medical history, and stated that the records revealed Anderson had pre-existing neck pain and a torn, unrepaired right rotator cuff, which injury occurred in 2005.  (Wyard Expert Report ("Wyard Rep.") at 11, Wing Aff. Ex. E.)  Wyard notes that there is nothing to indicate a significant head injury, left shoulder rotator cuff injury, or right shoulder rotator cuff injury from the officers' actions.  (*Id.*)

Wyard disagrees with Wengler about the most likely mechanism of injury to Anderson's right arm, instead reporting that it was most likely caused when he hit the counter, and not when he was pulled up from the floor.  (Wyard Rep. at 13.)  He says

---

[1] Wengler did not specify to what other alternative he was referring.

"[i]f the mechanism of injury at that time was severe enough to have fractured his ribs, it was severe enough to have fractured his right proximal humerus . . . [and] the fracture is consistent with an impaction-type injury as opposed to a twisting type injury." (*Id.* at 14.)

## DISCUSSION

## I.  STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

## II.  HOPKINS POLICE DEPARTMENT AND "UNNAMED" INDIVIDUALS

Municipal police departments are not legal entities subject to suit.  *In re Scott Cty. Master Docket*, 672 F. Supp. 1152, 1163 n.1 (D. Minn. 1987); *Ketchum v. City of West Memphis*, 974 F.2d 81, 82 (8th Cir. 1992) ("The West Memphis Police Department and West Memphis Paramedic Services are not juridical entities suable as such.  They are simply departments or subdivisions of the City government."); *Franco v. Grant*, Civ. No.

09-0552, 2010 WL 653855, *6 (D. Minn. Feb. 22, 2010) ("A municipal police department is not a cognizable legal entity, or person, subject to suit under § 1983, but is simply part of a larger municipality."). Further, discovery has closed in this case and Anderson has not named or served additional "unidentified" officers. Therefore, the Court grants defendant Hopkins Police Departments' motion for summary judgment as to claims against it. Further, the Court grants defendants' motion for summary judgment on Anderson's claims against "unknown" officers, as none have been identified.

## III.    CLAIMS UNDER  42 U.S.C. § 1983

Defendants argue that the officers are protected by qualified immunity and are thus entitled to summary judgment. Because qualified immunity is "an **immunity from suit** rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985). The "driving force" behind creation of the qualified immunity doctrine was a desire to ensure that "'insubstantial claims' against government officials [will] be resolved prior to discovery . . . ." *Anderson v. Creighton,* 483 U.S. 635, 640 n.2 (1987). Accordingly, "[the Supreme Court] repeatedly [has] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant,* 502 U.S. 224, 227 (1991) (per curiam).

This Court considers two questions to determine whether the officials are protected by qualified immunity: (1) whether the facts that Anderson has alleged or shown, when viewed in his favor, support a finding that the conduct of the officers

violated a constitutional right, and (2) whether that constitutional right was "clearly established" at the time of the incidents such that a reasonable officer would have known that his or her actions were unlawful. *Pearson v. Callahan*, 129 S. Ct. 808, 815–16 (2009); *see also Saucier v. Katz,* 533 U.S. 194, 201 (2001). "Qualified immunity is appropriate only if no reasonable fact-finder could answer yes to both of these questions." *Nelson v. Corr. Med. Serv.*, 583 F.3d 522, 528 (8th Cir. 2009).

### A.    Constitutional Right

"The right to be free from excessive force is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures of the person." *Crumley v. City of St. Paul, Minn.*, 324 F.3d 1003, 1007 (8th Cir. 2003) (quotation marks and citation omitted); *see also Graham v. Connor*, 490 U.S. 386, 395 (1989) ("[A]*ll* claims that law enforcement officers have used excessive force . . . in the course of an arrest . . . or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach."). However, individuals acting in an official capacity are entitled to qualified immunity unless their actions indicate immunity has been forfeited. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.").

### 1.     Excessive Force by Kreiling

The reasonableness of the use of force depends on the circumstances of each case, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396.   Further, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.* Courts must make allowance for the fact that police officers often make split-second judgments, and that "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment."  *Id.* at 396-97.  "The question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting them . . . ."  *Id.* at 397.

Anderson alleges that the officers used excessive force in tackling, handcuffing, and pulling him to his feet.   Anderson argues it was objectively unreasonable for defendants to grab him, throw him down, and then lift him off the ground by his arms. He argues that a reasonable officer would not behave in that manner, and "would conclude that the law forbade him from gratuitously behave [sic] in the above manner . . . ."  (Pl.'s Opp'n at 15, Docket No. 23.)  Further, Anderson argues that this behavior was objectively unreasonable after he was handcuffed and had already been cooperating with the officers.  (*Id.*)

The use of some force is reasonable when an arrestee disobeys orders.  *See e.g. Foster v. Metro. Airports Comm'n*, 914 F.2d 1076, 1082 (8th Cir. 1990) (finding that

pulling someone from a car and handcuffing them in response to tearing up a parking ticket was not excessive force under the circumstances).  "It may also be appropriate to consider the extent of any injury sustained by the suspect . . . and standard police procedures."  *Nelson v. Cty. of Wright*, 162 F.3d 986, 990 (8th Cir. 1998) (internal citations omitted) (citing *Ludwig v. Anderson*, 54 F.3d 465, 472 (8th Cir. 1995)).  While the Eighth Circuit has stated "[i]t remains an open question in this circuit whether an excessive force claim requires some minimum level of injury," *Hunter v. Namanny,* 219 F.3d 825, 831 (8th Cir. 2000), a de minimus use of force or injury is insufficient to support a finding of a constitutional violation.  *Id.* at 831–32; *see also Curd v. City Court,* 141 F.3d 839, 841 (8th Cir. 1998) (reasoning that without an allegation of injury, "[e]ven if seizing an [arrestee's] arm and turning her body was unnecessary to effect the arrest, we cannot conclude that this limited amount of force was objectively unreasonable." (footnotes omitted)).  Therefore, in addition to the circumstances surrounding the use of force, to determine the reasonableness of the use of force, the Court may also consider the **result** of the force.  *Crumley*, 324 F.3d at 1007.

Additionally, the Eighth Circuit has found varying degrees of force reasonable where a suicidal person fails to obey a police officer's commands.  *Nelson v. Cty. of Wright*, 162 F.3d at 990.  In *Nelson*, the court found that where plaintiff had been acting violent and suicidal, and actively resisted arrest, a reasonable officer would have known that force could be used to overcome the resistance.  The plaintiff in *Nelson* reached for the officer's gun and shoved him, thus the use of force, including striking the plaintiff in the head, was reasonable.  *Id.*

Further,

> [T]he reasonableness inquiry extends only to those facts known to the officer at the precise moment the officers effectuate the seizure . . . . Neither [o]fficer . . . at the time they approached [plaintiff], knew whether he was armed.   A reasonable officer could have believed that either [plaintiff] was armed or easily could obtain a weapon . . . and do harm to himself or [others].

*Lacy v. City of Bolivar*, 416 F.3d 723, 727 (8th Cir. 2005) (internal quotation marks omitted).

In arriving at Anderson's apartment, Kreiling knew that Anderson reported he was on the verge of slitting his throat with a knife, and when Anderson answered the door, he immediately turned around and started walking towards the kitchen, where knives are usually kept.  Kreiling twice told Anderson to leave the kitchen, but Anderson continued walking further into the kitchen and told Kreiling that he would cut his own throat. Kreiling acted, first tackling Anderson to the ground, then handcuffing him and bringing Anderson to his feet.  Viewing the facts in a light most favorable to Anderson, the Court must conclude that the injury occurred when Kreiling lifted Anderson from the ground by the handcuffs.

Again, although this presents a close call due to the nature of the threat posed by Anderson's conduct, a reasonable officer would know that Kreiling's actions in "taking down" Anderson, and his subsequent treatment of Anderson, constituted excessive force. Though the situation escalated rapidly, and Anderson was within reach of weapons, a reasonable officer would have known that bringing a handcuffed individual to his feet in a way that caused significant injury constituted excessive force.   There is sufficient

evidence from which a jury may determine that Anderson was injured by Kreiling's actions, thus Anderson's constitutional right to be free from excessive force under the Fourth Amendment was violated.

### 2.    Failure to Prevent Harm

A claim against an officer under § 1983 for failure to intervene or prevent harm necessarily assumes another officer violated plaintiff's constitutional rights. *Putman v. Gerloff*, 639 F.2d 415, 423 (8th Cir. 1981). "[O]ne who is given the badge of authority of a police officer may not ignore the duty imposed by his office by failing to act to prevent the use of excessive force." *Nance v. Sammis*, 586 F.3d 604, 611-12 (8th Cir. 2009) (internal quotation marks omitted) (quoting *Putman v. Gerloff*, 639 F.2d 415, 423 (8th Cir. 1981)). "An officer will thus be liable for failing to intervene to halt the unconstitutional use of force if (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Maeberry v. City of St. Paul*, Civ. No. 09-1216, 2010 WL 2814285, at *6 (D. Minn. July 16, 2010) (internal quotation marks omitted) (quoting *Nance*, 639 F.2d at 612)).

It is unclear if Pilon and Hall knew or had reason to know that excessive force would be used. The officers' testimony, coupled with the audio transcripts from the Dispatcher, and the video from the Taser camera, all suggest that the entire encounter with Anderson took no longer than 15-20 seconds. Kreiling was the first officer in the door, and according to the testimony, he took control of the situation and acted without

discussing his actions with the other officers.  Further, it appears that Pilon and Hall did not have the means or the opportunity to prevent Kreiling from acting as he did.  Kreiling decided to "take-down" Anderson on his own, and then did so.  The Court finds that officers Pilon and Hall did not violate Anderson's constitutional rights by failing to prevent harm.  Therefore, qualified immunity applies and the Court grants defendant's motion for summary judgment as to Hall and Pilon.

### B.    Clearly Established Right

The second step in determining if qualified immunity applies is whether the constitutional right at issue was clearly established.  "For a constitutional right to be clearly established, its contours must be 'sufficiently clear that a reasonable official would understand that what he is doing violates that right . . . . [I]n the light of pre-existing law the unlawfulness must be apparent.'"  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).  Defendants point to a situation in which a police officer caused a fatal injury when he tackled a man suffering from alcohol withdrawal and disorientation, to prevent him from escaping a hospital.  *McVay ex rel. Estate of McVay v. Sisters of Mercy*, 399 F.3d 904 (8th Cir. 2005).  The Eighth Circuit found that "even if [the officer] forced [plaintiff] to the ground in a 'tackle,' doing so was not an excessive use of force.  It is clear that [plaintiff] posed a threat at least to himself [when he would have run full speed into glass doors the officer knew could not open]."  *Id.* at 908–09; *see also Monday v. Oullett*, 118 F.3d 1099, 1100-01 (6th Cir. 1997) (finding that use of pepper spray was not excessive force when used by officer to avoid injury through physical confrontation with

a large and intoxicated person even though it caused a severe reaction and required hospitalization for five days).

Defendants argue that in this case, Anderson was "clearly going to kill himself," and the officers did not have time to investigate background information about him or negotiate options.  Defendants ask the Court to balance the likely outcome if Kreiling took down Anderson, against what would have happened if he did nothing, and determine that if the officers had done nothing, Anderson would be dead.  A broken arm and ribs, they argue, are a less severe result.

The facts suggest Anderson was going to attempt to kill himself, and had access to weapons that would allow him to do so, thus a reasonable officer may not have been aware that the force used to "take down" Anderson was excessive.  Further, plaintiff has not suggested in what manner Anderson **should** have been brought to his feet, and Kreiling's testimony suggests that instead of "jerking him to his feet," Anderson was rolled onto a knee, then helped up.  However, because the facts are in dispute about exactly how Anderson was brought to his feet, and because at least some evidence suggests that it was Kreiling's actions that injured Anderson in bringing him to his feet, the Court finds that Anderson had a clearly established right to be free from injury once in custody, a right that was violated.  Thus, qualified immunity does not apply as to Kreiling.

IV.   *Monell* **Claim**

Anderson claims the City of Hopkins maintains an unconstitutional policy or custom by failing to train and supervise its police officers in the course of their duties.  In *Monell v. Dep't of Soc. Servs. of City of New York*, the Supreme Court held that a municipality is subject to liability under 42 U.S.C. § 1983 only when the violation of the plaintiff's federally protected right can be attributed to the enforcement of a municipal policy.  436 U.S 658, 694 (1978) ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.").   Therefore, municipalities cannot be held liable under § 1983, "unless action pursuant to official municipal policy of some nature caused a constitutional tort."   *Kuha v. City of Minnetonka,* 365 F.3d 590, 603 (8th Cir. 2003) (quoting *Monell,* 436 U.S. at 691) (overruled on other grounds); *Sitzes v. City of W. Memphis Ark.*, 606 F.3d 461, 470 (8th Cir. 2010) (without any underlying constitutional violation, a plaintiff cannot maintain a claim against a local government).

If the Court determines that a constitutional violation has occurred, it must evaluate whether there is an unconstitutional policy or custom that caused the harm.  "A 'policy' is an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters."   *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999).  To sustain a failure-to-train claim under *Monell*, Anderson must show: (1) the City's training practices were inadequate; (2) the City was deliberately indifferent to the rights of others in adopting its training practices

such that its failure reflects a deliberate or conscious choice by the City; and (3) the alleged deficient training procedures actually caused Anderson's injuries. *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996). Anderson "must demonstrate that the [City] had notice that its procedures were inadequate and likely to result in a violation of constitutional rights." *Parrish v. Ball*, 594 F.3d 993, 997–98 (8th Cir. 2010) (internal quotation marks and citation omitted). Further, "effective training need not specifically address every conceivable situation an employee may encounter . . . ." *Jennings v. Wentzville R-IV Sch. Dist.*, 397 F.3d 1118, 1123 (8th Cir. 2005).

Officer Hill testified that he took a one-hour class on suicide prevention, and all three officers testified that they have responded to hundreds of suicide calls. There is no evidence in the record of this case that the training defendants received as police officers was in any way deficient as it relates to suicide prevention. Each officer testified to receiving some formal training on suicide prevention and dealing with suicidal people, and each officer has extensive practical experience dealing with suicidal people. Similarly, there is no evidence in the record that the City was deliberately indifferent to the rights of others by failing to provide training on suicidal people. Moreover, it is unclear that such training would have had any effect here, where time for negotiation and discussion was not possible and swift action could have appeared required to a reasonable officer. Finally, there is no evidence that any failure to train defendants on dealing with suicidal people **caused** Anderson's injuries. There appeared to have been little time to talk with Anderson, who was deeply inebriated and moving towards weapons he had designated as his method of suicide. Anderson has not put forth any suggestion as to how

suicide prevention training would have counseled an alternative to defendants' actions. The Court finds no genuine issue of material fact that the City of Hopkins is liable under *Monell* and grants summary judgment on that claim.

## V.   STATE LAW CLAIMS

Defendants assert that they are entitled to official immunity for their actions during the encounter with Anderson.  Minnesota state law provides that "a public official charged by law with duties which call for the exercise of his judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong."  *Elwood v. Rice Cnty.*, 423 N.W.2d 671, 678 (Minn. 1988) (quoting *Susla v. State,* 247 N.W.2d 907, 912 (1976)).   "Police officers are generally classified as discretionary officers entitled to official immunity."  *Maras v. City of Brainerd,* 502 N.W.2d 69, 77 (Minn. Ct. App. 1993) (citing *Johnson v. Morris,* 453 N.W.2d 31, 42 (Minn. 1990)).

In the official immunity context, willful and malicious are synonymous, *Rico v. State*, 472 N.W.2d 100, 107 (Minn. 1991), and mean "intentionally committing an act that the official has reason to believe is **legally** prohibited."  *Kelly v. City of Minneapolis*, 598 N.W.2d 657, 663 (Minn. 1999) (citing *State by Beaulieu v. City of Mounds View*, 518 N.W.2d 567, 571 (Minn. 1994) (emphasis added)).   This definition differs from the common law understanding of malice and intent.

> The [malice] exception does not impose liability merely because an official **intentionally** commits an act that a court or a jury subsequently determines is a wrong.  Instead, the exception anticipates liability only when an official

- 17 -

CASE 0:09-cv-01912-JRT-JJK   Document 29   Filed 03/28/11   Page 18 of 19

> intentionally commits an act that he or she then has reason to believe is
> [legally] prohibited.

*Rico,* 472 N.W.2d at 107.   The intent of official immunity is to protect honest law

enforcement efforts but not "to shield police brutality."   *Elwood*, 423 N.W.2d at 679.

Therefore, the officers are entitled to official immunity unless the facts, in a light most

favorable to Anderson, demonstrate malice.

Here, there is evidence that Kreiling knew that some or all of his actions were

unlawful.  His statement that "next time" Anderson will listen to a police officer, coupled

with the actual injury Anderson suffered, suggests that a jury may find that he took

actions he knew to be legally prohibited.  The Court finds there is a genuine issue of

material fact as to whether Kreiling acted with malice, thus official immunity does not

apply to Kreiling.

Further, a city is liable for the torts of employees acting within the scope of

employment or duties.  Minn. Stat. § 466.02.  "Political subdivisions [such as the City of

Hopkins] may be liable for the torts of their officers . . . acting within the scope of their

employment under the doctrine of respondeat superior."  *Watson by  Hanson v. Metro.*

*Transit Comm'n*, 553 N.W.2d 406, 414 (Minn. 1996).  Here, defendants were clearly

acting within the scope of their employment and were furthering the interests of the city.

Thus, respondeat superior applies and Anderson's state law claims against defendants

Kreiling and the City of Hopkins remain at issue.

This case will be placed on the Court's next available trial calendar.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that defendants City of Hopkins, Hopkins Police Department, Officer Kreiling, Officer Pilon, Officer Hill, and Jane Doe and Richard Roe's motion for summary judgment [Docket No. 13] is **GRANTED in part** and **DENIED in part**, as follows:

1.      The motion is **GRANTED** as to plaintiff's *Monell* claims.

2.      The motion is **GRANTED** as to the Hopkins Municipal Police Department, Officers Hill and Pilon, and Jane Doe and Richard Roe.  Plaintiffs' claims against those defendants are **DISMISSED with prejudice**.

3.      The motion is **DENIED** in all other respects.


DATED:   March 28, 2011
at Minneapolis, Minnesota.

s/ John R. Tunheim

JOHN R. TUNHEIM
United States District Judge